IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE CONSOSPO-PEREZ,<br><br>Defendant. | 8:15CR20<br><br>FINDINGS AND RECOMMENDATION |

This matter is before the court on the motion to suppress by defendant Jose Consospo-Perez (Consospo-Perez) (Filing No. 57). Consospo-Perez is charged in the Indictment along with defendants Crispin Herra-Herra, Ines Rivadeneyra-Herrera, and Jesus Munguia-Aguilar with a conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 (Filing No. 35). Consospo-Perez seeks to suppress evidence seized from a red Ford Ranger truck and from the person of Consospo-Perez by law enforcement officers on December 9, 2014, near 24th and G-H Streets in Omaha, Nebraska.

The court held an evidentiary hearing on the motion to suppress on July 7, 2015. Consospo-Perez was present with his counsel Christopher J. Roth. Assistant U.S. Attorney Nancy A. Svoboda represented the United States. Laura Garcia-Hein served as an interpreter in the Spanish language. The court heard the testimony of Special Agent Craig Allrich (Special Agent Allrich) of Homeland Security Investigations (HSI) Immigration and Customs Enforcement (ICE). A transcript (TR.) of the hearing was prepared and filed on July 9, 2015. **See** Filing No. 70. There was no post-hearing briefing.

**FINDINGS OF FACT**

Over the last two years, Special Agent Allrich, in conjunction with other law enforcement officers, has been investigating a drug trafficking and money laundering organization (organization) based in Mexico that brings drugs to Omaha and sends the proceeds from the sale of those drugs to Mexico (TR. 4). On November 9, 2014, Special Agent Allrich received information an individual, known as Borieto, later

identified as Ines Rivadeneyra, uses a particular telephone number and drives a green Volkswagen Jetta (Jetta) to arrange and make deliveries for the organization in Omaha (TR. 4-5). Thereafter, Special Agent Allrich obtained an electronic surveillance warrant on Borieto's telephone and Jetta (TR. 5, 26). After following Borieto for several days, Special Agent Allrich learned Borieto worked at Galaxy Painting and noted Borieto's associates (TR. 5-6). On November 17, 2014, Special Agent Allrich saw Borieto enter a red Ford Ranger (Ranger) with an individual later identified as Herra-Herra (TR. 5-6, 25). Special Agent Allrich testified the Ranger was driven in a counter-surveillance manner, meaning the driver drove slowly, around five to ten miles below the speed limit, switched lanes, and made unnecessary turns (TR. 6-7). The driver of the Ranger first stopped at a house at 72nd and Lawndale Streets (Lawndale Street residence) and an unidentified male exited the vehicle (TR. 6). The Lawndale Street residence is the registered address for Galaxy Painting (TR. 6). Special Agent Allrich believed the organization stored its bulk narcotics at the Lawndale Street residence because people would come to the residence during the day, but not stay at night (TR. 7-8, 12).

After the Ranger stopped at the Lawndale Street residence, the Ranger proceeded to a house at 38th and Q Streets (Q Street residence), which was later identified as Herra-Herra's residence (TR. 6). Special Agent Allrich identified Herra-Herra by cross referencing surveillance photos and videos from pole cameras, one of which was located near the Lawndale Street residence (TR. 9). Pole cameras were also installed near the Q Street residence and Jesus Munguia's (Munguia), a co-defendant and owner of Galaxy Painting, house at 67th and Charles Street (Charles Street residence) (TR. 9-10). The Q Street residence was significant to Special Agent Allrich because Munguia, who was in charge of the organization, Borieto, and members of the organization, including Galaxy Painting employees, would visit the residence frequently (TR. 10, 22).

As Special Agent Allrich continued his investigation, he narrowed his focus on the Lawndale Street residence and Rivadeneyra, Herra-Herra, and Munguia as "the main players of the organization" (TR. 12). On December 9, 2014, Special Agent Allrich saw Munguia arrive at Herra-Herra's Q Street residence with "a backpack very clutched over his shoulder, like he didn't want to lose it, an indication for us that was probably a

bunch of narcotics' proceeds" (TR. 12). Herra-Herra and Munguia left the Q Street residence, while Munguia still carried the backpack, and drove to Family Dollar wherein they purchased rubber gloves (TR. 12-13). Special Agent Allrich suspected Herra-Herra and Munguia purchased rubber gloves to keep their fingerprints off currency packaging (TR. 12-13). At around noon on December 9, 2014, Munguia returned to his residence and then later that day, still carrying the backpack, he went back to Herra-Herra's Q Street residence (TR. 13-14). Thereafter, Herra-Herra and Munguia left the Q Street residence (TR. 14). Munguia left in a Honda Civic (Civic) (TR. 14). Herra-Herra left in a Nissan Altima (Altima) (TR. 14). A K-9 officer subsequently stopped Munguia (TR. 14, 23). During the traffic stop, officers discovered "approximately $180,000 worth of narcotics proceeds bundled, wrapped, ready to go in the backpack that [officers] had seen [Munguia] carrying throughout the morning" (TR. 14, 23). After the traffic stop, Munguia spoke with law enforcement and identified Herra-Herra as someone who works with Munguia (TR. 23). Munguia did not identify Consospo-Perez (TR. 23).

During Munguia's traffic stop, Herra-Herra drove by in the Altima (TR. 14-15). Officers followed Herra-Herra to the Charles Street residence and noticed electronic surveillance indicated Consospo-Perez, who remained unidentified,[1] was driving toward the Charles Street residence in the Ranger (TR. 15-16). After arriving at the Charles Street residence, both Herra-Herra, in the Altima, and Consospo-Perez, in the Ranger, proceeded to the 120th and Maple area, near where Consospo-Perez resides (TR. 15-16). Herra-Herra and Consospo-Perez both eventually entered the Ranger, with Consospo-Perez driving, and proceeded to a Boost Mobile[2] store (TR. 16-17). Consospo-Perez entered Boost Mobile and exited a short time later with a bag (TR. 16-17). The stop at Boost Mobile was significant to Special Agent Allrich because he thought, based on previous investigation of the organization, Herra-Herra was dropping his old phone and obtaining a new phone after witnessing Munguia's traffic stop (TR.

---

[1] Although Consospo-Perez is referenced by name in events that occurred prior to the traffic stop in question in this case, Consospo-Perez was not identified until the traffic stop. **See** TR. 12, 16-17, 21, and 26-27.
[2] Boost Mobile sells phones and is "a cell phone company with Sprint Mobile, that uses Sprint Mobile prepaid. . . . A prepaid phone is a phone that you can put in anybody's name and it doesn't have to come back to a real address." **See** TR. 32-33.

3

16-17, 33). Special Agent Allrich suspected Herra-Herra was trying to coordinate delivery of twenty or thirty pounds of methamphetamine (TR. 17).

After leaving Boost Mobile, Consospo-Perez drove in a counter-surveillance manner (TR. 17-18). Consospo-Perez drove past Munguia's traffic stop and continued east on Q Street and around south Omaha (TR. 17-18). Special Agent Allrich and Officer Apley followed the Ranger (TR. 18). Special Agent Allrich testified Herra-Herra was Special Agent Allrich's target and "was going to get questioned" on December 9, 2014 (TR. 30). At one point, Special Agent Allrich suspected the driver of the Ranger was trying to evade Special Agent Allrich by making quick turns and not making complete stops (TR. 19, 29). At approximately 24th and L Streets, Special Agent Allrich witnessed the Ranger drive through a red light (TR. 19, 29). Special Agent Allrich radioed an Omaha Police Department (OPD) K-9 officer, Officer Pignotti, to effectuate a traffic stop of the Ranger (TR. 19, 27). Special Agent Allrich told Officer Pignotti to "just make the stop" (TR. 19). In response to Officer Pignotti's question "Do we need to develop our probable cause?", Special Agent Allrich stated "No. We have plenty of probable cause. They're trying -- it looks like they're trying to evade us now. Make the stop." (TR. 19, 29-31). Officer Pignotti subsequently stopped the Ranger at 24th and H Streets at around 2:30 or 3:00 p.m. on December 9, 2014 (TR. 19). Special Agent Allrich immediately joined the traffic stop (TR. 20).

After Herra-Herra and Consospo-Perez were asked to exit the Ranger, Special Agent Allrich conducted a pat-down of Consospo-Perez to check for weapons (TR. 27-28). Special Agent Allrich discovered money in Consospo-Perez's pocket, but returned the money to Consospo-Perez's pocket after verifying it was not a knife or gun (TR. 28). After the pat-down, Special Agent Allrich inquired whether Consospo-Perez had identification, whether he was a citizen, and whether he had immigration papers (TR. 20, 27). Consospo-Perez responded "No" to each inquiry (TR. 20). Thereafter, Herra-Herra and Consospo-Perez were taken to Immigration and Customs Enforcement (ICE) office for interviews (TR. 20-21). Consospo-Perez was in handcuffs (TR. 21). In the middle of a seat in the Ranger, the bag from Boost Mobile and a telephone were visible and taken from the Ranger and the Ranger was impounded (TR. 20). At the ICE office, Agent Doug Rice **Mirandized** Consospo-Perez and Consospo-Perez agreed to speak,

4

and in fact did speak, with law enforcement (TR. 21). Prior to December 9, 2014, although Special Agent Allrich believed the organization used the Ranger for drug trafficking activities, he never saw Consospo-Perez utilize the Ranger for such activities (TR. 24). Throughout Special Agent Allrich's investigation, he did not know who drove the vehicles identified in the investigation because Herra-Herra and Borieto would switch vehicles frequently (TR. 11). Special Agent Allrich later discovered the Ranger was registered to Miguel Consospo, who Special Agent Allrich identified as Consospo-Perez (TR. 11, 22, 25).

## LEGAL ANALYSIS

### A. Traffic Stop

"A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause." **United States v. Houston**, 548 F.3d 1151, 1153 (8th Cir. 2008); **see also United States v. Hollins**, 685 F.3d 703, 705-06 (8th Cir. 2012). "A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver. An officer is justified in stopping a motorist when the officer objectively has a reasonable basis for believing that the driver has breached a traffic law." **United States v. Coleman**, 700 F.3d 329, 334 (8th Cir. 2012) (internal quotations and citations omitted). "An otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search." **United States v. Wright**, 512 F.3d 466, 471 (8th Cir. 2008) (internal quotation marks omitted); **see also United States v. Frasher**, 632 F.3d 450, 453 (8th Cir. 2011).

According to Neb. Rev. Stat. § 60-6,119(1) of the Nebraska Rules of the Road:

> The driver of any vehicle shall obey the instructions of any traffic control device applicable thereto placed in accordance with the Nebraska Rules of the Road, unless otherwise directed by a peace officer, subject to the exceptions granted the driver of an authorized emergency vehicle in the rules.

Neb. Rev. Stat. § 60-6,119(1). Additionally, Neb. Rev. Stat. § 60-6,123(3)(a) provides: "Vehicular traffic facing a steady red indication alone shall stop at a clearly marked stop line or shall stop, if there is no such line, before entering the crosswalk on the near side of the intersection or, if there is no crosswalk, before entering the intersection."

5

In the instant matter, Special Agent Allrich observed the driver of the Ranger drive through the intersection of 24th and L Streets despite a red light.  **See** TR. 19, 29.  Special Agent Allrich relayed this information to the OPD and Officer Pignotti responded and initiated a traffic stop.  **See** TR. 19; **see also** *United States v. Gordon*, 741 F.3d 872, 876 (8th Cir. 2013) (finding, based on collective information, an officer had reasonable suspicion the defendant violated traffic laws warranting the stop of a vehicle) (**citing** *United States v. Robinson*, 119 F.3d 663, 666-67 (8th Cir. 1997) ("An officer may rely on information provided by other officers and all of the information known to the team of officers involved in the investigation to provide justification for a stop.")).  As failing to stop at a red light is a violation of the Nebraska Rules of the Road, Officer Pignotti had probable cause to conduct the traffic stop.

**B.      Search and Arrest**

"[T]he Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions."  *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007) (internal quotation marks omitted).  Contemporaneous with a valid traffic stop, the officer may "conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop."  *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010).  In fact, a police officer may detain the occupants while completing a number of routine tasks.  **See** *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013).  "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop.  Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (internal citations and quotation marks omitted) (alteration in original).

Also during a valid traffic stop "[o]fficers may conduct a protective pat-down search for weapons . . . when they have objectively reasonable suspicion that a person

with whom they are dealing might be armed and presently dangerous and criminal activity might be afoot." **United States v. Gaffney**, No. 14-2100, 2015 WL 3691121, at *3 (8th Cir. June 16, 2015) (citation omitted); **see also United States v. Chartier**, 772 F.3d 539, 544 (8th Cir. 2014).

> In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training. A pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. In examining the relevant facts and inferences, we must keep in mind that minimally intrusive weapons searches at traffic stops will more likely be reasonable because of the inherent danger of traffic stops.

**United States v. Preston**, 685 F.3d 685, 689 (8th Cir. 2012) (internal citations, quotation marks, and brackets omitted).

The court finds Special Agent Allrich's pat-down of Consospo-Perez was justified. Special Agent Allrich preformed the pat-down to check for weapons. **See** TR. 27-28. In this instance, Special Agent Allrich was dealing with more than a routine traffic stop. While the stop was authorized because of a traffic violation, in addition to Consospo-Perez driving in a counter surveillance manner, Special Agent Allrich also had information at least one of the individuals in the Ranger was involved with a drug trafficking organization. **See** TR. 5-6, 9, 12-17, 25, and 30. Here, it was reasonable for Special Agent Allrich to believe Consospo-Perez and Herra-Herra were dangerous and criminal activity was afoot based on the suspected drug trafficking. **See United States v. Bustos-Torres**, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."). Accordingly, Special Agent Allrich conducted a constitutionally permissible pat-down of Consospo-Perez.

Following the pat-down, Special Agent Allrich asked for Consospo-Perez's identification and whether Consospo-Perez was a citizen and had immigration papers. **See** TR. 20, 27. Consospo-Perez responded "No" to each inquiry. **See** TR. 20. Because Consospo-Perez did not have any identification, admitted he was not a citizen,

7

and did not have immigration papers, Special Agent Allrich had probable cause to arrest Consospo-Perez. **See, e.g., *Nebraska v. Sassen***, 484 N.W.2d 469, 472 (Neb. 1992) (driving without a driver's license provided probable cause to arrest defendant); Neb. Rev. Stat. § 60-484 (driver's license required); 8 U.S.C. § 1227 (classes of deportable aliens). Any subsequent search of Consospo-Perez's person and vehicle were done incident to his lawful arrest. **See *Chartier***, 772 F.3d at 545 ("Among the exceptions to the warrant requirement is a search incident to a lawful arrest.") (**quoting *Arizona v. Gant***, 556 U.S. 332, 338 (2009)). Because the court finds there are no constitutional infirmities with Consospo-Perez's stop and arrest, and Consospo-Perez does not otherwise challenge the voluntariness of his statements, there is no fruit of the poisonous tree issue to address with regard to Consospo-Perez's statements.

**IT IS RECOMMENDED TO SENIOR JUDGE JOSEPH F. BATAILLON that:**

Consospo-Perez's Motion to Suppress (Filing No. 57) be denied.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 23rd day of July, 2015.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge